J^CHEHARDY, Judge.
In this matter, the trial court rendered judgment in favor of plaintiff on three different claims, and rendered judgment for defendants on their reconventional demand on a portion of one of their claims, to be applied as a credit against the judgment in the main demand. Defendants appeal. For the following reasons, we amend and affirm as amended.
On August 23, 1990, plaintiff, Warren Seal (hereafter Warren), filed suit against Sealexco, Inc. and brothers Ben and Jerry Seale (hereafter Sealexco, Ben and Jerry). In 1983, Warren, Ben and Jerry formed Sealexco, a Louisiana oil and gas company which acquired properties, sought investors for drilling expenses, drilled wells and split profits. Warren was president of Sealexco, Ben was secretary/treasurer and Jerry was vice-president.
After the parties had a “falling out” in 1986, Warren sold his interests in Sealexco to Ben and Jerry via a “stock redemption agreement.” Warren’s lawsuit, which was later consolidated with two other lawsuits from Iberia Parish between the same parties and concerning related issues, asserted claims for, inter alia, unjust enrichment, funds due on the stock redemption agreement, and a 1.062% “after casing point” (ACP) interest in a mineral lease. Ben, Jerry and Sealexco reconvened, alleging, inter alia, “corporate opportunities and/or monies wrongfully taken” by Warren, and a percentage of Sealexco’s liabilities due from Warren under the stock redemption agreement. Jerry was subsequently dismissed from [3the suits, and the matter proceeded to a bench trial on September 16, 18, and 19, 1996.[1] The parties were allowed to file post-trial memoranda and *164 the trial court took the matter under submission.
On February 6, 1998, the trial court rendered judgment, in pertinent part, as follows: 1) in favor of Warren and against Ben and Sealexco in the amount of $126,-000.18 on the unjust enrichment claim; 2) in favor of Warren and against Sealexco in the amount of $124,828.77 pursuant to the stock redemption agreement; and 3), in favor of Warren and against Sealexco in the amount of $52,085.25 in the 1.062% ACP claim. The trial court also awarded $21,629.85 in favor of defendants on their reconventional demand, to act as a credit against the amounts owed by Sealexco to Warren. Ben and Sealexco appeal, asserting that the trial court erred in granting the three monetary awards to Warren on the main demand, and further erred in failing to make any award on their corporate opportunities and/or monies wrongfully taken claim and in failing to award the full amount of them claim against Warren on the percentage of Sealexco’s liabilities they asserted was due. For the following reasons, we amend and affirm as amended.
The first issue for us to review is whether the trial court erred in awarding damages to Warren for unjust enrichment. Warren testified at trial that his unjust enrichment claim arose out of payments he made for drilling and completion costs of various wells Sealexco operated in Iberia Parish (hereafter the Iberia Prospect). •
As explained by Warren, his duties at Sealexco included reviewing submissions from various companies holding rights to drill wells on parcels of land. Warren testified that he is a petroleum geologist with many years of experience in the oil and gas field, and he would analyze the geological data of a certain parcel and then make recommendations to the other officers of Sealexco as to whether or not it was a viable field for oil and gas exploration. Each officer would have the right of first refusal of buying a percentage of the operating | ¿interest in the proposed wells. Sealexco would then look for outside partners to purchase working interests in order to gain capital to drill and operate the wells.
Warren further testified that an individual who owned a working interest in the Iberia Prospect, Warren Knight, forfeited a portion of his interest when he failed to pay his full share of the expenses. Warren testified that after meeting with Ben, he believed that they reached an agreement that would allow Warren to purchase a portion of the Knight forfeited interest individually. Warren therefore paid the drilling, completion and lease operating costs of the various wells that were due from the portion of the Knight forfeited interest which he believed he owned, a total of approximately $120,000.00.
At some point thereafter, the individuals in Sealexco disagreed on who was entitled to the profits from the Knight forfeited interest, and the succeeding operator of the Iberia Prospect, Crescent Drilling and Exploration (hereafter Crescent), instituted a eoncursus proceeding in Iberia Parish to determine the true owner(s) of the proceeds. Crescent placed the amounts in dispute into the registry of the court.
As the relationship between Warren and Ben had soured, on March 7, 1986, the parties executed a stock redemption agreement, in which Warren divested himself of the 40% of Sealexco’s stock which he owned, and exchanged it for 40% of the corporation’s mineral assets it owned in various properties. Warren also agreed to pay 40% of Sealexco’s current liabilities. In conjunction therewith, a detailed audit was performed on Sealexco, to determine what its assets and liabilities were at the time. Thereafter, trial took place and a final judgment was rendered in the concur-sus proceeding in favor of Ben and Sealex-co, finding that they were entitled to the full amount of the Knight forfeited interest which had been placed into the registry of the court, a total of over $800,000.00.
In the instant proceeding, Warren testified at trial that because Ben and Sealexco *165 were allowed to withdraw the full amount of the funds placed into the registry of the court in the concursus proceeding, they were unjustly enriched, as Warren had paid approximately $120,000.00 of the drilling and completion costs of the Knight forfeited interest. In addition to his testimony, Warren offered the testimony of Bernard Hagstette and Richard Halprin, lstwo individuals who were involved in the operation, management and/or accounting of the Iberia Prospect for other companies. Each witness verified that Warren had made these expense prepayments on the disputed portion of the Knight forfeited interest. Halprin, the joint interest accountant for Crescent in the Iberia Prospect, further testified that no expense prepayments on the disputed interest were received from either Ben or Sealexco.
On appeal, defendants assert that the trial court judgment is erroneous as a matter of law because La. C.C. art. 2298 only provides a limited cause of action for unjust enrichment, and that it does not apply herein because Warren could have recovered the prepayments he made directly from the parties he paid (i.e., the operators of the Iberia Prospect). We disagree.
Testimony at trial was clear that Warren paid these costs so that the Iberia Prospect wells could be operated and profits could eventually result if the drilling was successful. It is illogical to argue that Warren could recover these funds directly from the operators (Sealexco and Crescent), as the operators did not retain the funds; the funds were used to operate the wells. The concursus proceeding found that the profits belonged to Ben and Sea-lexco. However, it is clear from the record that Ben and Sealexco did not pay the operating expenses which were necessary to generate the profits. They were therefore unjustly enriched by having the benefit of the profits without paying what was required for the profits to be realized.
Accordingly, we find that the trial court did not err in awarding damages to Warren for unjust enrichment.
The second issue for us to review is whether the trial court erred in its determination of the amount of damages due to Warren under the stock redemption agreement. Sealexco admits that Warren is owed something for his share of the Knight forfeited interest pursuant to the stock redemption agreement (40% of Sea-lexco’s assets), but argues that the true figure is substantially less than that awarded by the trial court.
The trial court based the amount of its award on the testimony of Ron Baumann, a certified public accountant who was qualified as an expert in accounting at trial. Mr. | fiBaumann testified that the award in the final judgment in the earlier concursus proceeding was “subject to the provisions of a stock redemption agreement between Warren Seal and Sealexco.” Mr. Bau-mann’s calculation of the amount due to Warren under the stock redemption agreement was $124,828.77. This is the amount awarded to Warren by the trial court in its February 6,1998 judgment.
At trial, Sealexco offered the testimony of Steve Skarda, who was qualified as an expert in accounting, with a sub-specialty in oil and gas accounting. However, Mr. Skarda did not make his own calculation as to the amount due Warren under the stock redemption agreement, testifying, “I only know that the [Baumann] calculation is incorrect, I don’t know what the correct calculation should be.” Mr. Skarda later testified that because of factors he felt were not considered by Mr. Baumann in making his calculation, Skarda’s conservative estimate of an amount the Baumann calculation should be reduced was somewhere between seven and ten percent.
It is well settled that it is for the fact finder to evaluate conflicting expert opinions in relation to all the circumstances of the case. Credibility determinations, including the evaluation of and *166 resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact, which will not be disturbed on appeal in the absence of manifest error. Hezeau v. Pendleton Methodist Memorial Hospital, 97-1865 (La.App. 4 Cir.7/15/98), 715 So.2d 756, 759 (citations omitted).
Upon review, we note that there Was somewhat of a conflict in the testimony of the experts with regards to the amount due to Warren under the stock redemption agreement. While Warren’s expert, Mr. Baumann, gave the trial court a specific figure based on his calculations, all Sealex-co’s expert could give the trial court was his opinion that Baumann’s calculations were wrong. When pressed, on cross-examination Sealexco’s expert admitted that in his best, conservative estimate, Bau-mann’s calculations were only off by seven to ten percent.
17Under the circumstances, we find that the trial court was clearly not manifestly erroneous in awarding Warren damages under the stock redemption agreement based on the figure provided by Mr. Bau-mann.
The third issue for us to review is whether the trial court erred in awarding Warren damages on his 1.062% ACP interest claim. This claim arose as a result of two board of directors meetings of Sealex-co held on October 15, 1985, and January 9, 1986, the minutes of which were entered into the record as plaintiffs exhibits C-l and C-2. At both meetings, the ownership percentages of the before casing points (BCP) and after casing points (ACP) of several wells were delineated.[2] In three of the wells, J.E. Schwing Well # 3, J.E. Schwing Well # 4, and J.E. Schwing Well # D-l, Warren was granted a 1.062% ACP interest. As part of the February 6, 1998 judgment, the trial court awarded Warren $52,085.25 on this claim. This figure was based on the calculations made and testified to at trial by plaintiffs accounting expert, Ron Baumann, with a reduction Warren conceded to in his post-trial memorandum.
On appeal, Sealexco argues that this claim is barred by res judicata. As also argued to the trial court herein, Sea-lexco asserts that this claim was already adjudicated and denied in the earlier con-cursus proceeding in Iberia Parish, and affirmed on appeal by the Louisiana Third Circuit Court of Appeal.[3] Upon review, we do not see any indication that the earlier concursus proceeding adjudicated Warren’s separate ACP ownership claims over the above-referenced Schwing wells, as evidenced by plaintiffs exhibits C-l and C-2. Indeed, only “[t]he ownership of the funds attributable to the [Knight] Forfeited Interest in the Schwing Nos. 3, 4, C-1, C-2 and C-3 wells is the subject of this [con-cursus] litigation.” Crescent |₈Drilling and Development, Inc. v. Sealexco, Inc., 570 So.2d 151, 153 (La.App. 3 Cir.1990), writ denied, 575 So.2d 373 (La.1991) (emphasis added).
Sealexco next argues that there is no legal basis for Warren’s ownership of the 1.062% ACP interest because the obligation to transfer such an interest must be evidenced by a written instrument. However, the minutes of the above-referenced board of directors meetings were reduced to writing and signed by both Ben and Jerry Seale, acting in their official capacities as directors of Sealexco. There was no evidence presented, nor argument made, that the Seales did not have the authority to grant the 1.062% ACP ownership interests to Warren at their board of *167 directors meetings. We therefore find this argument to likewise be without merit.
Sealexeo lastly argues, with regards to this issue, that the amount awarded by the trial court should be further reduced because the percentage used to reduce the amount in the first instance was too low (37%, as opposed to 37.76%). Sealexeo therefore argues that Warren is only entitled to $43,673.45 for this claim. In his appellate brief, Warren agrees with this revised figure. Accordingly, we hereby amend the trial court judgment of February 6, 1998, to reduce the amount awarded to appellant, Warren Seal, on his 1.062% ACP interest claim to the sum of $43,-673.45.
The final issue for us to review is whether the trial court erred in denying the majority of defendants’ reconventional demand. Sealexeo asserts that there are two transactions between Warren and Sealexeo which were at issue in Sealexco’s “corporate opportunities and/or monies wrongfully taken” claim in their reconventional demand: 1) Warren’s execution, as president of Sealexeo, of an assignment of an overriding royalty in the Angie Prospect from Sealexeo to himself, resulting in Warren’s receipt of $42,288.66; and 2) Warren’s deposit of three checks from Exchange Oil and Gas into Sealexco’s bank account and subsequent treatment of those funds as loans from himself to Sealexeo for which he received a credit of $34,770.34.
With regards to the overriding royalty claim, Warren testified at trial that the Angie Prospect was a venture on the Louisiana/Mississippi border with which he was involved prior |9to the inception of Sealexeo. The override was initially assigned to Sealexeo by Alatex Energy, Inc., a company for which Warren performed various services on the Angie Prospect. Warren testified that when he realized the error in Sealexeo being named the assign-ee, Warren, as President of Sealexeo, executed an assignment of the overriding royalty to himself. Warren further testified that he used no Sealexeo funds to put the Angie Prospect together.
Warren’s testimony was collaborated by the President of Alatex, Louis F. Goza, who testified via deposition. Mr. Goza testified that Warren assisted in putting the Angie Prospect together in two ways: making geologic recommendations and in acquiring some of the land leases. Mr. Goza further testified that his only knowledge of the existence of Sealexeo was “that it had something to do with Warren,” and that he did not know either of the Seales. Specifically regarding the overriding royalty interest assignment, Mr. Goza testified that it was “a commission in payment for the benefits that we derived from association with Warren,” and that it was intended as a payment to Warren, not Sealexeo.
Considering the foregoing, we find that the trial court did not err in failing to find that Sealexeo was entitled to any of the overriding royalty interest assigned by Alatex.
With regards to the three checks from Exchange Oil and Gas which were deposited into Sealexco’s bank account, two of the checks were issued to Warren individually and the third check was issued to Warren and Sealexeo. Warren testified at trial that he deposited the checks into Sealex-co’s account, then accounted for them as a loan from himself to Sealexeo. Warren further testified that at that time, he was more concerned with getting Sealexeo “off the ground,” and the checks were payments from Exchange to him for the interest he held in the Angie Prospect.
We further note in the record an apparent ratification of the credit Warren received for this loan. Pursuant to the audit performed in conjunction with the execution of the stock redemption agreement, there is a credit to Warren “from loans to Sealexeo.” The credit is the exact amount of the total of the three checks from Exchange, $34,762.34.
| mConsidering the foregoing, we see no error in the trial court’s failure to award damages to Sealexeo for their “corporate *168 opportunities and/or monies wrongfully taken” claim in their reconventional demand.
Finally, we address Sealexco’s claims in its reconventional demand regarding money owed under the stock redemption agreement. As stated earlier, the trial court awarded Sealexco $21,629.85 on its reconventional demand, representing attorney’s fees paid by Sealexco in three lawsuits and based on the percentage of liabilities owed by Warren pursuant to the stock redemption agreement. Sealexco claims the trial court erred in not awarding a percentage of Sealexco’s attorney’s fees in two other suits (the instant one included) and in two audit liability claims. The trial court found that these claims accrued after the effective date of the stock redemption agreement and/or Sea-lexco failed to meet its burden in proving these claims. Upon review, we see no error in the trial court’s failure to award additional damages to Sealexco under the stock redemption agreement.
Accordingly, for the foregoing reasons, the trial court’s judgment of February 6, 1998, is amended to reduce the amount awarded to appellant, Warren Seal, on his 1.062% ACP interest claim to the sum of $43,673.45. In all other respects, the trial court’s judgment of February 6, 1998, is affirmed.
AFFIRMED AS AMENDED.

. As Jerry was dismissed from the suits, we will only refer to the remaining principals herein (i.e., Warren, Ben and Sealexco).

. As part of Sealexco's operation of various wells, it would secure working interest owners to fund the expenses of drilling a well to a target depth before casing was run into the hole — the before casing point (BCP). Once the casing point was reached, the drilling partners would decide whether to participate in funding the expenses necessary to complete the well — the after casing point (ACP).

. See Crescent Drilling and Development, Inc. v. Sealexco, Inc., 570 So.2d 151 (La.App. 3 Cir.1990), writ denied, 575 So.2d 373 (La.1991).